# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

MARK ANTHONY ERB,

     *Plaintiff*,

*v*.                                                    CASE NO. 4:13-cv-14798

CAROLYN W. COLVIN,                 DISTRICT JUDGE MARK A. GOLDSMITH
Commissioner of Social Security,          MAGISTRATE JUDGE PATRICIA T. MORRIS

     *Defendant*.

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED** and that Defendant's Motion for Summary Judgment be **GRANTED**.

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned to review the Commissioner's decision denying Plaintiff's claim for Disability Insurance Benefits ("DIB") under Title II of the Social

---

[1]The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://www.uscourts.gov/RulesAndPolicies/JudiciaryPrivacyPolicy/March2008RevisedPolicy.aspx. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

Security Act 42 U.S.C. § 401-34. The matter is currently before the Court on cross-motions for summary judgment. (Docs. 10, 14.)

This is Plaintiff Mark Anthony Erb's second DIB application. (Tr. at 13, 61.) His first, filed on January 8, 2010, alleged that his disability began on August 27, 2009. (Tr. at 61.) The Commissioner initially denied the claim on March 23, 2010, and after a hearing in front of administrative law judge ("ALJ") Dennis M. Matulewicz, the Commissioner made her final decision denying benefits on November 17, 2010. (Tr. at 13, 68.) The Appeals Council declined to review that decision, on February 15, 2012. (Tr. at 83.)

Plaintiff then filed the present DIB claim on May 17, 2011, alleging that his disability began on November 18, 2010, the day after the prior final decision. (Tr. at 137.) In denying the claim, the Commissioner considered inflammatory bowel disease and "[o]steoarthrosis and [a]llied [d]isorders." (Tr. at 82.) Plaintiff requested a hearing and on June 19, 2012 he appeared before ALJ Martha Gasparovich, who considered the application *de novo*. (Tr. at 27-57.) The ALJ issued a written decision on August 10, 2012, finding that Plaintiff had not presented any "new and material evidence" showing that his condition had worsened since the prior final decision. (Tr. at 13.) Thus, the ALJ concluded that she was bound by the final decision, and found he was not disabled. (Tr. at 13, 20.)

Plaintiff requested review of the decision on August 21, 2012. (Tr. at 9.) The ALJ's decision became the Commissioner's final decision, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on September 26, 2013, when the Appeals Council denied Plaintiff's request for review. (Tr. at 1-4.) On November 21, 2013, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision. (Compl., Doc. 1.)

2

### B.      Standard of Review

The Social Security system has a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the factual determinations for substantial evidence. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The administrative process provides multiple opportunities for reviewing the state agency's initial determination. The plaintiff can first appeal the decision to the Social Security Agency, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142 (1987). Once this administrative process is complete, an unsuccessful claimant may file an action in federal district court. *Sullivan v. Zebley*, 493 U.S. 521, 524-28 (1990), *superseded by statute on other grounds*, Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction under 42 U.S.C. § 405(g) to review the Commissioner's final administrative decision. The statute limits the scope of judicial review, requiring the Court to "'affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.'" *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). The court's review of the decision for substantial evidence does not permit it to "'try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility.'" *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (noting that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."))); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely on an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "'there exists in the record substantial evidence to support a different conclusion.'" *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)). *See also Mullen*, 800 F.2d at 545. The court can only review the record before the ALJ. *Bass*, 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). *See also Jones*, 336 F.3d at 475. "[T]he . . . standard is met if a 'reasonable mind

might accept the relevant evidence as adequate to support a conclusion.'" *Longworth*, 402 F.3d at 595 (quoting *Warner*, 375 F.3d at 390). "The substantial evidence standard presupposes that there is a '"zone of choice"' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (quoting *Mullen*, 800 F.2d at 545).

A court's review of the Commissioner's factual findings for substantial evidence must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006); *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("'[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'" (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999))).

## C.   Governing Law

"'The burden lies with the claimant to prove that she is disabled.'" *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 275 (6th Cir. 2010) (quoting *Foster*, 279 F.3d at 353). *Accord Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994)). There are several benefits programs under the Act, including the DIB program of Title II, 42 U.S.C. §§ 401-434, and the Supplemental Security Income ("SSI") program of Title XVI, 42 U.S.C. §§ 1381-1385. Title II

benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty-stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston*, 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin*, 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work." *Jones*, 336 F.3d at 474. *See also Cruse*, 502 F.3d at 540. The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.   ALJ Findings

The first ALJ, analyzing Plaintiff's 2010 application, applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff met the insured-status requirements through December 31, 2013, and had not engaged in substantial gainful activity since August 27, 2009, the alleged onset date. (Tr. at 63.) At step two, the ALJ concluded that Plaintiff had the following severe impairments: "[C]rohn's disease and pancreatitis; chronic diarrhea; colitis; spondyloarthropathy; rheumatoid arthritis/polyneuropathy; diabetes; back pain (lumbago); obesity; alcohol abuse; and nicotine dependence." (*Id.*) At step three, the ALJ found that Plaintiff's combination of impairments did not meet or equal any of the listings in the regulations. (*Id.*) The residual functional capacity ("RFC") assessment indicated that Plaintiff could perform a limited

range of "light work," a specific regulatory category. (Tr. at 63-64); 20 C.F.R. § 404.1567(b). At step four, the ALJ found that Plaintiff could perform his past relevant work as a warehouse supervisor. (Tr. at 66.) The dispositive finding at step four ended the analysis.

In the present claim, the ALJ noted that Sixth Circuit precedent required him to adopt various prior findings if "new and material evidence" failed to show Plaintiff's condition worsened after the first decision. (Tr. at 13.) *See Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997); *Dennard v. Sec'y of Health & Human Servs.*, 907 F.2d 598 (6th Cir. 1990). Determining that such evidence did not exist, the ALJ adopted findings concerning "the claimant's past relevant work as well as the finding of the claimant's date of birth, education, and work experience," and also the previous RFC. (Tr. at 13.)

Accordingly, he found at step one that Plaintiff met the insured-status requirements through December 31, 2014 and had not participated in substantial gainful activity since the new onset date, November 18, 2010. (Tr. at 15.) The ALJ's step-two list of severe impairments changed only slightly: Plaintiff's alcohol abuse was now in remission and he no longer had nicotine dependence; but he suffered from anal-rectal abscesses. (Tr. at 16.) The RFC remained the same. (Tr. at 16.) The step-three listing analysis likewise found that Plaintiff's impairments, alone and combined, did not meet or equal a listed impairment. (*Id.*) At step four, the ALJ incorporated vocational expert ("VE") testimony that Plaintiff could not perform any of his past relevant work, but also accepted the VE's conclusion that Plaintiff had acquired work skills from his past jobs. (Tr. at 19.) These skills were transferable to jobs existing in significant numbers in the national economy, and thus the ALJ concluded at step five that Plaintiff could work and was not disabled. (Tr. at 20.)

### E.      Administrative Record

8

1.     **Medical Records**

Dr. Gary Jasbeck, Plaintiff's primacy care physician, began seeing Plaintiff in January 2004. (Tr. at 614.) His earliest relevant records cover prescription refills in November and December 2010, indicating that Dr. Gary Jasbeck was treating Plaintiff for pancreatitis, edema, gastrointestinal bleeding, and hypertension. (Tr. at 670-74.) In January 2011, Dr. Jasbeck referred Plaintiff to gastroenterologist Robert Stoler, (Tr. at 669), and rheumatologist Martin Garber, (Tr. at 668). Shortly after, Dr. Stoler ordered a colonoscopy; the results confirmed chronic colitis. (Tr. at 548.)

On December 16, 2010, Plaintiff visited Dr. Garber. (Tr. at 723.) The notes are brief, stating only that Plaintiff complained of persistent low back and knee pain, and had been taking Vicodin. (*Id.*) Next month, on January 7, Plaintiff returned for an evaluation of his arthropathy, which Dr. Garber noted was related to his Crohn's disease. (*Id.*) His right knee and both elbows ached, unrelieved by Humira, which Plaintiff thought no longer helped. (*Id.*) The notes state that Dr. Jasbeck had recently prescribed Neurontin "[b]ecause of the possibility of 'fibromyalgia.'" (*Id.*) That helped him sleep but left the pain and fatigue unresolved. (*Id.*) Plaintiff informed Dr. Garber that he sought disability benefits. (*Id.*)

The examination results from that visit were largely normal; Plaintiff did not have any joint synovitis, his elbows had a full range of motion, but showed "some . . . epicondyles tenderness without associated swelling," his right knee had "some crepitus and decreased flexion" but no joint effusion, his left knee had a full range of motion, and his legs were free of edema. (*Id.*) Dr. Garber stated that the back pain and other symptoms could relate to fibromyalgia, but he did not see any evidence of "active inflammatory joint disease" and instead thought it "very likely that his low

back pain [was] secondary to mechanical back problems, possibly related to his significant obesity, less likely [to] lumbar canal stenosis." (*Id.*) The knee pain likely resulted from his "previously documented osteoarthritis." (*Id.*) Dr. Garber thought the high risk of narcotic dependency counseled against their use. (*Id.*) Instead, he prescribed physical therapy and switched his Neurontin prescription to Lyrica. (*Id.*) He also noted that Plaintiff had "employed a dietitian" to aid his weight loss. (*Id.*)

Dr. Jasbeck examined Plaintiff in January, focusing on his diabetes, hypertension, and hyperlipidemia. (Tr. at 662.) Plaintiff complained that the diabetes, which he had for years, was increasingly affecting him, causing excessive thirst, frequent urination, growing fatigue, and irritability. (*Id.*) His hands were not numb, however, and he denied blurred vision or burning sensations. (*Id.*) His hypertension, also a long-term impairment, was "currently stable," the physician wrote. (*Id.*) Tremors accompanied the hypertension, but he experienced no other symptoms. (*Id.*) The hyperlipidemia was fairly "controlled," though his lifestyle–obesity, poor diet, lack of exercise–hindered further improvement. (*Id.*) Dr. Jasbeck observed that Plaintiff made "minimal" effort to clean up his diet and no effort at all to exercise, and recommended he try to improve in these areas. (*Id.*)

Dr. Jasbeck then began the examination. (Tr. at 663.) Plaintiff professed fatigue; other systems were not symptomatic; he experienced no chest pain, malaise, night sweats, or visual issues. (*Id.*) He had a "[l]ong standing [sic] history of diarrhea and fitula that [he] is looking at getting repaired," and also had rheumatoid arthritis, which he treated with "multiple medications."

10

(Tr. at 663-64.) The list of chronic conditions included, among others, alcohol abuse,[2] anal fistulae, "[b]enign hypertension," Crohn's disease, hyperlipidemia, lumbago, and diabetes. (Tr. at 664.) He was married with two children, had pet cats, and was moderately active. (*Id.*) The physical examination found all measures normal. (Tr. at 665.) Dr. Jasbeck wrote that Plaintiff had the "ability and willingness to enact [a] treatment plan" for his diabetes. (*Id.*) Laboratory tests ordered during the session, (Tr. at 658-60), came back normal, except his high-density lipoprotein ("HDL"), or "good cholesterol," was low. (Tr. at 658.) Dr. Jasbeck called Plaintiff with the results, again reiterating the need for a healthy diet and weight loss. (Tr. at 653.)

Plaintiff saw Dr. Stoler on January 26, 2011. (Tr. at 718.) Dr. Stoler wrote that Plaintiff had Crohn's disease since 2004 and was hospitalized in 2009 for abdominal pain; he suspected that the mix of alcohol and medication caused the episode. (*Id.*) A December 2009 colonscopy revealed mild colitis in the colon, not the rectum, and did not uncover a fistula. (*Id.*) Contemporaneous biopsies confirmed "minimally active chronic muscosal colitis" in the colon, "[m]inimally active chronic mucosal procitis" in the rectum, and "quiescent chronic muscosal colitis in the cecum." (*Id.*) During this period, the notes state, Dr. Robert Cleary was treating Plaintiff for "chronic anorectal fistulae" and an anal abscess; Plaintiff never followed up with the recommendation that he undergo an anaesthetized examination. (*Id.*) The perianal pain and "subjective swelling continued," and pads managed to contain the perianal drainage. (*Id.*) Plaintiff did not exercise, he reported. (*Id.*) Dr. Stoler did not think Plaintiff's chronic diarrhea could be completely explained

---

[2] Chart updates from later that month and the next removed alcohol abuse from the list of chronic conditions, although it is unclear whether this was intentional or an oversight. (Tr. at 646, 648, 650, 654.)

by proctocolitis "given [the] last colonoscopy," and instead believed that Plaintiff's diet, diabetes, and prior alcoholism all played a role. (*Id.*)

Plaintiff returned to Dr. Cleary in February 2011. (Tr. at 541.) The session notes reflect that Plaintiff had "a chronic left ischioanal abscess and [Dr. Cleary] offered him exam [sic] under anesthesia in December 2009, but he did not follow through with this." (Tr. at 541.) During that February visit, Plaintiff stated he stopped drinking alcohol in November 2010 and cut his smoking to three cigarettes per day. (*Id.*) Plaintiff exercised two to three times per week, riding a bicycle or walking. (Tr. at 542, 599, 601.) His chief complaint was his Crohn's disease, first diagnosed in 2004, he explained, when anorectal issues initially manifested. (*Id.*) One effect was frequent bowel movements, approximately five to six times every day. (*Id.*) According to Dr. Cleary, Plaintiff appeared "a little bit more willing at this time" to consider an examination of the ischioanal abscess. (*Id.*) The review of systems was normal; in particular, Plaintiff denied back pain, frequent urination, abdominal pain, bloody stools, and diarrhea. (Tr. at 542, 602.) The physical examination was similarly unremarkable except for Plaintiff's rectum. (Tr. at 543, 603.) Dr. Cleary observed external hemorrhoids, abscess, and chronic induration, or hardened skin; but the area was not tender. (*Id.*) Plaintiff said the abscess "drain[ed] purulent material on a daily basis," which Dr. Cleary thought likely were produced from "an internal opening inside the anus," and Plaintiff requested treatment. (Tr. at 544, 604.) They discussed a drainage procedure and Dr. Cleary provided educational materials. (Tr. at 544, 600, 604.)

The following week, Dr. Stoler performed a sigmoidoscopy, investigating the inflamation in Plaintiff's rectum. (Tr. at 539, 598.) He observed the edema, erosions, granularity, and abscess. (*Id.*) The notes compared the findings with colonoscopy records from December 2009, which

found colitis but determined that it did not significantly impair the rectum. (*Id.*) Now, however, Dr. Stoler thought that his condition had "worsened compared to previous examinations." (*Id.*) They planned surgery, followed by medications and vigilant monitoring. (*Id.*)

On the morning of February 11, 2011, Plaintiff arrived at the hospital for the surgical drainage procedure. (Tr. at 364-536.) He was examined prior to the operation without any significant findings, informing the surgeon that he remained unchanged since the last examination. (Tr. at 399.) He remained sober, he informed the examiner, but still smoked. (Tr. at 382, 384, 397.) Both before and after the surgery, Plaintiff told a nurse that his pain level was acceptable, though the pain fluctuated. (Tr. at 354, 386, 406, 472.) Dr. Cleary conducted the surgery, reporting that it went off without complication and Plaintiff "tolerated the procedure well." (Tr. at 405.) They discovered a large area of "mild induration and edema" on the left buttock. (Tr. at 404.) The edematous perianal skin was "consistent with perianal Crohn's disease," Dr. Cleary reported; however, he found no active abscess, he could not discover any internal openings, and no potential openings exuded purulent material. (*Id.*) Nor could the doctor find any areas of fluctuance. (*Id.*) Possible proctitis caused oozing during the procedure. (Tr. at 405.) Plaintiff stayed overnight and was examined the next day. (Tr. at 520.) In the morning, the notes indicate he had a steady gait, the incision sight contained only "[s]cant" drainage, (*Id.*), and he again said the pain was acceptable. (Tr. at 472.) Dr. Cleary sent him to Dr. Caleb Schroeder for a post-operation outpatient evaluation. (Tr. at 365.) Dr. Schroeder noted that the "[p]osteroperative course was uncomplicated" and he was tolerating the diet and medications; Plaintiff would need to follow up with Dr. Cleary. (Tr. at 365.)

Dr. Cleary described the procedure and results in a letter to Dr. Jasbeck. (Tr. at 592.) The large phlegmon blotching Plaintiff's left buttock was drained and Dr. Cleary found no purulent abscess. (*Id.*) He hoped antibiotics would resolve the issue, though he believed that the Crohn's disease was the cause and the symptoms would recur. (*Id.*)

On February 19, 2011, he went to the emergency room, reporting "unspecified" chest and abdominal pain present over the previous four days. (Tr. at 305, 356-57, 362, 677.) The pain began when he started taking Metformin in 2009, the last time he remembered having pancreatitis. (Tr. at 300, 677.) He reported that he was allergic to the drug. (*Id.*) He included Crohn's disease, back pain, and diabetes in his medical history. (Tr. at 303, 677.) However, his back was not tender . (Tr. at 301, 678.) Cigarette use persisted, while he continued to abstain from alcohol. (Tr. at 301, 677.) His breathing was normal, (Tr. at 300-01, 305, 356-57, 678), as was an electrocardiogram ("ECG") measuring his sinus rhythm, which they also compared to a 2009 ECG and found "no significant change . . . ." (Tr. at 341.) Chest x-rays also came back normal. (Tr. at 337, 676.) His pain score, presumably measured on a ten-point visual analog ("VA") scale, began at eight and later ebbed to three, which was an acceptable level according to Plaintiff. (Tr. at 304, 333, 344, 351-52.) The diagnosis was acute pancreatitis–Dr. Carmen Foster, reviewing test results, said it was likely "mild"–and prescribed oxycodone. (Tr. at 302, 310, 314, 321, 327, 362, 679.) Notes of a call Plaintiff's wife made to Dr. Jasbeck's office on February 23, 2011, stated that Plaintiff was "feeling much better." (Tr. at 645.)

Plaintiff returned for a follow up appointment with Dr. Cleary on March 7, 2011. (Tr. at 293.) On an unsigned form, with questions addressed to Plaintiff and thus presumably answered by him, his current and past medical history included only high blood pressure, diabetes, arthritis,

and chronic back pain; unchecked were elevated blood lipids (hyperlipidemia), alcoholism, and inflammatory bowel disease (Crohn's disease). Mark H. Beers & Robert Berkow, eds., *The Merck Manual of Diagnosis and Therapy* 200-11 (17th ed. 1999) (defining and discussing hyperlipidemia and Crohn's disease). Again, Plaintiff related he smoked but did not drink; and he also listed his exercise regimen of biking or walking two to three times per week. (Tr. at 294.) He did not mark any box to indicate he had symptoms. (Tr. at 295.)

In the session notes, Dr. Cleary wrote that he found during the surgery "a large edematous, mildly indurated area . . . and a smaller area on the right [that was] very edamatous[;] however[,] there was no discrete abscess. There was no purulent material . . . . There was no internal opening." (Tr. at 287.) He excised three "packed," subcutaneous wounds that seemed to "fill[] up when he has bowel movements," as Plaintiff described. (*Id.*) Dr. Cleary thought Crohn's disease explained the skin issues. (Tr. at 288.) The doctor was "concerned that [because of] his skin changes . . . ultimately he may require proctectomy and will have huge perineal wound issues" and, depending on the examination, might need to consult a plastic surgeon. (*Id.*) Asked if he wished to have Dr. Cleary examine, under anesthesia, the possibility that the wounds refilled, Plaintiff agreed, and also wished to explore weight loss options. (*Id.*)

Dr. Garber examined Plaintiff on March 8, 2011. (Tr. at 722.) Plaintiff reported that his back pain, morning stiffness, and fatigue had all improved recently. (*Id.*) The surgery in February disrupted his physical therapy sessions; he attended five and felt they helped. (*Id.*) Lyrica had also helped his pain. (*Id.*) Dr. Garber continued the Lyrica and noted that the Humira would also ease his "inflammatory back disease." (*Id.*) Finally, Plaintiff requested a letter supporting his disability application. (*Id.*)

The anaesthetized examination with Dr. Cleary took place on March 17. (Tr. at 282.) Before the procedure, a nurse examined Plaintiff, finding no abnormalities. (Tr. at 219-24.) Plaintiff reported no changes since the prior examination, (Tr. at 217), and rated his pain at level zero. (Tr. at 223.) Dr. Cleary observed that the wounds from the previous examination were healing. (Tr. at 243.) Edema spread on his left buttock and anorectal area, "but no fluctuance, no abscess, no evidence of anorectal sepsis." (*Id.*) The principal diagnosis was again anal and rectal abscesses and Crohn's disease. (Tr. at 243, 245, 282.) *See 2* J.E. Schmidt, *Attorneys' Dictionary of Medicine and Word Finder* E-126 (2013) (defining enteritis). Other findings included "likely edematous skin changes related to [C]rohn's disease, some ulceration, [and] friable rectal mucosa." (Tr. at 245.) Plaintiff was up walking after the surgery and left for home the same day, rating his pain at level zero on a VA scale. (Tr. at 246.) A discharge document included a brief plan of care, suggesting another drainage procedure similar to Plaintiff's February surgery. (Tr. at 232.)

A few days prior to the procedure, Plaintiff had visited Dr. Jasbeck to announce he sought disability benefits. (Tr. at 641.) His wife had called the office earlier, requesting Dr. Jasbeck draft a letter for the Social Security office. (Tr. at 644.) Plaintiff came to the appointment bearing a note from Dr. Garber supporting his application, and Dr. Jasbeck assured Plaintiff he concurred. (*Id.*) Any other purpose for the visit is obscure. The session report states he had Crohn's and related spondyloarthropathy. (*Id.*) The physical examination went well; Plaintiff was under no apparent distress or anxiety and his breathing sounded normal. (Tr. at 642.)

Plaintiff's post-procedure appointment with Dr. Cleary came on April 4, 2011. (Tr. at 577.) The notes state he had "moderately severe perianal Crohn's and that the most recent examination found "perianal skin changes consistent with Crohn's," a large indurated area on his buttock, and

"furrowing in the anoderm and perianal skin . . . ." (*Id.*) He did not have any phlegmon or abscesses, and his wounds had healed. (*Id.*) A few undesirable options presented themselves at this point. Dr. Cleary could excise the indurated area, but this "big operation" would involve plastic surgery and might not work in any case. (Tr. at 578.) If medication "management" proved inefficacious, "he may be a candidate for procteotomy some day, and this would involve a large and onerous and labor intensive perianal wound." (*Id.*)

Dr. Jasbeck examined Plaintiff on April 18, 2011. (Tr. at 632.) Plaintiff acknowledged that he had become more sedentary, but was "interested in quitting smoking. . . . [and] becoming active again." (*Id.*) Nonetheless, he thought his diabetes grew worse. (*Id.*) Dr. Jasbeck rated Plaintiff's efforts to exercise and diet as "moderate," but he later said Plaintiff made minimal efforts at diet and no efforts to exercise. (*Id.*) Plaintiff denied vision problems, chest pain, palpitations, medication side effects, foot issues, and other symptoms. (*Id.*) His hypertension remained stable, and his hyperlipidemia was in "fair control." (*Id.*) Daily exercise topped the list of recommendations, followed by a low-saturated-fat diet. (*Id.*) The review of his systems and physical examination were unexceptional, flagging no concerns. (Tr. at 634-36.) Later that month, Dr. Jasbeck wrote Platintiff that his laboratory test results "[l]ook[] great!" (Tr. at 627.) In particular, his blood sugar level was within the desired range. (*Id.*)

Plaintiff consulted with Dr. Stoler on April 22, 2011. (Tr. at 699.) The doctor noted that the weekly Humira dose of forty milligrams did not decrease the diarrhea, perianal discomfort, and swelling, so he doubled the dosage. (*Id.*) Plaintiff reported that he quit smoking that week, maintained sobriety, exercised, and was attempting to clean up his diet and lose weight. (*Id.*) As a means to index his Crohn's inflammation, Dr. Stoler planned to measure Plaintiff's C-reactive

protein ("CRP") level. (*Id.*) The next month, he congratulated Plaintiff for the "great" drop in his CRP. (Tr. at 698.)

In June, Plaintiff contacted Dr. Jasbeck again seeking a form to support his disability application. (Tr. at 626.) Shortly thereafter, he brought in the disability paperwork during a session. (Tr. at 623, 687.) The notes state that Dr. Garber sent a copy of the disability forms he filled out. (*Id.*) Plaintiff informed Dr. Jasbeck that he had remained sober since the prior year, had not smoked in three months, and kept a healthy diet. (Tr. at 623-24, 688.) The "Plan" the notes laid out dealt with his spondyloarthropathy, advising him to "Avoid lifting, bending, twisting. Avoid activities which exacerbate symptoms. Increase attention to weight loss." (Tr. at 623, 687.) Most of the physical examination results remained normal; however, now Plaintiff's thoracic and lumbar mobility decreased, allowing him "[v]ery limited extension and lateral tilt" and "[p]ractically no mobility of [the] lower lumbar spine." (Tr. at 625, 689.)

Plaintiff visited Dr. Garber on June 8, 2011 for his "Crohn's-related spondyloarthropathy and to fill out disability forms." (Tr. at 721.) His condition remained unchanged since the previous appointment, he reported. (*Id.*) Dr. Garber noted the CRP test and concluded his "Crohn's disease is fairly well-controlled." (*Id.*) The notes are brief; there is no indication of a thorough physical examination, only a line containing his blood pressure and stating Plaintiff did not have peripheral joint synovitis. (*Id.*) They filled out the disability forms and agreed to meet again in six months. (*Id.*)

Dr. Stoler evaluated Plaintiff's Crohn's disease on July 20, 2011. (Tr. at 690, 696.) Plaintiff described the course the disease had taken since his visit in January, describing his "daily, nonbloody diarrhea, and increased perianal discomfort and swelling." (*Id.*) The sigmoidoscopy

18

showed "moderately severe [rectum] disease . . . ." (*Id.*) Since March, when Plaintiff began a new Humira dosage, he "had improvement in diarrhea, buttock discomfort, and his spondyloarthropathy [had] responded . . . ." (*Id.*) Diet adjustments helped too, and he now had only two to three bowel movements per day and only occasional perianal drainage. (*Id.*) Overall, Dr. Stoler concluded that the Crohn's had "clinically improved"; Plaintiff's chronic perianal induration without abscess or active fistula was "stable and tolerable"; and he still had spondyloarthropathy, a rising body mass index (measuring body fat), and diabetes. (*Id.*) He tinkered with Plaintiff's prescriptions, recommended weight loss, and told him to return in three months. (*Id.*)

Plaintiff returned on October 7, 2011. (Tr. at 691, 693.) At the prior appointment, the doctor halved the Humira dosage; since then, Plaintiff had not noticed "a significant change in baseline diarrhea." (*Id.*) Instead, the diarrhea seemed to correlate with his diet, increasing when he ate vegetables and roughage. (*Id.*) His diet also accounted for heartburn, often coming on at night; he tried to eat earlier. (*Id.*) Plaintiff "confesse[d] he [was] unable to diet," though he dropped seven pound after his last visit. (*Id.*) Buttock swelling and drainage still occurred, but sitz baths helped his perianal induration. (*Id.*) After his wife lost her job, they were without medical insurance; Dr. Stoler's office administered "compassionate Humira therapy," allowing him to continue the medication. (*Id.*) The final "Impression" remained similar, adding the need for acid reduction treatment. (*Id.*) Plaintiff was to return in six months. (*Id.*)

Plaintiff saw Dr. Garber again on December 7, 2011 to examine the spondyloarthropathy and fill out more disability forms. (Tr. at 721.) "He continues to have good and bad days," wrote Dr. Garber, adding that his Crohn's disease remained the primary problem, particularly the diarrhea. (*Id.*) His back pain was unchanged. (*Id.*) The examination notes are again abrupt; they

list Plaintiff's blood pressure and note his lack of rashes, synovitis, and edema. (*Id.*) The treatment plan was similarly scant, only recommending that Plaintiff continue Humira and return in six months. (*Id.*) The final record comes from the end of March 2012, when Plaintiff's wife telephoned Dr. Stoler's office to request medication refills. (Tr. at 729.) The notes state that Plaintiff was "doing well . . . ."[3] (*Id.*)

## 2. Medical Source Opinion Statements

Numerous medical source opinion statements dot the record. During their March 14, 2011 visit, Plaintiff showed Dr. Jasbeck a letter from Dr. Garber supporting his disability application. (Tr. at 641.) Following the session, Dr. Jasbeck jotted a short "To Whom it May Concern" letter, noting Dr. Garber's diagnoses of Crohn's disease and spondyloarthropathy and agreeing that they should qualify him for disability. (Tr. at 640.) He referenced, without detailing, Plaintiff's limitations. (*Id.*)

The letter from Dr. Garber that Dr. Jasbeck referenced was likely one drafted on March 8, 2011. (Tr. at 200.) In this "To Whom it May Concern" letter, Dr. Garber described his assessment

---

[3] The ALJ did not consider many of the reports in the current record, which Plaintiff submitted for the first time to the Appeals Council. (Tr. at 732-73.) In this Circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, since it has been held that the record is closed at the administrative law judge level, those "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). Therefore, since district court review of the administrative record is limited to the ALJ's decision, which is the final decision of the Commissioner, the court can consider only that evidence presented to the ALJ. In other words, Appeals Council evidence may not be considered for the purpose of substantial evidence review.

In any case, many of these records report treatments from well before the alleged onset date. (Tr. at 732-57, 767-69.) Usually, such records provide at least marginally relevant information; but not here, as explained below. The issue here is whether Plaintiff can show by new and material evidence that his condition worsened after the prior ALJ decision. Thus, these reports fail to provide probative information. The rest of the Appeals Council records are yet more duplicates of reports that the ALJ considered. (Tr. at 539, 598, 627, 690, 691, 693, 696, 699, 707-08, 716-19, 758-66, 770-73.)

in a paragraph. (*Id.*) Plaintiff had "Crohn's-related spondyloarthropathy" and "long-standing back pain." (*Id.*) The latter was only "partially improved" with medications and physical therapy. (*Id.*) The back pain prevented him from standing for more than ten minutes, sitting for more than five without "having to get up and reposition himself," and walking for more than ten minutes. (*Id.*) He could not lift more than ten pounds. (*Id.*) Finally, Plaintiff's prognosis remained "poor." (*Id.*)

In May 2011, Dr. Stoler filled out a preprinted form describing Plaintiff's diagnoses and providing estimates of his functional capacities. (Tr. at 568-73.) Dr. Stoler first saw Plaintiff in 2004; the most recent visit was in April 2011, and the frequency of treatments varied. (Tr. at 568.) Plaintiff had Crohn's disease and obesity–Dr. Stoler did not select other diagnoses, including colitis, inflammatory bowel disease, and reflux disease. (*Id.*) The long-term prognosis was poor. (*Id.*) The clinical findings included chronic diarrhea, fatigue, nausea, pain, abdominal pain, and diffuse arthropathy. (Tr. at 569.) Plaintiff suffered these constantly, disrupting his concentration. (Tr. at 571.) Of the impairments, the perianal pain and diarrhea imposed the most severe limitations on his daily living. (Tr. at 569.) Dr. Stoler said there was evidence of "[m]ultiple recurrent inflammatory lesions," but not fistulae or abscesses. (Tr. at 569-70.) The pain stayed at level five out of ten on a VA scale. (Tr. at 570.) Plaintiff could handle low stress work, sit for zero to one hour, stand and walk for the same, and occasionally lift or carry up to ten pounds, but never more. (Tr. at 571-72.) Three absences a month from work were likely. (Tr. at 572.) Dr. Stoler estimated that 2004 was "the earliest date that the description of symptoms and limitations in this questionnaire applies." (Tr. at 573.)

Dr. Garber completed a similar form the next month. (Tr. at 605-12.) He had treated Plaintiff since 2005, seeing him two to four times per year. (Tr. at 605.) Plaintiff's significant

21

health issue was Crohn's-related spondyloarthropathy, a highly variable disease that precluded an accurate prognosis. (*Id.*) Testing results confirmed it, particularly a positive HLA B27 test and elevated CRP. (Tr. at 606.) Back pain was the only symptom Dr. Garber listed. (*Id.*) The pain was moderately severe and his fatigue was moderate; medications did not ease the pain. (Tr. at 607.) In a normal workday, Plaintiff could sit for three hours and stand or walk for zero to one hours; he could occasionally lift fifty pounds and carry twenty. (Tr. at 607-08.) His back pain required that he make minimal use of his arms for reaching; but he had no limitations on hand use. (Tr. at 609.) Work would exacerbate his symptoms and, in any case, Plaintiff would frequently struggle to concentrate due to pain. (Tr. at 609-10.) He would need unscheduled breaks and would miss more than three work days each month. (Tr. at 610-11.) Dr. Garber stated that 2005 was "the earliest date that the description of symptoms and limitations in this questionnaire applies." (Tr. at 611.) The same form was given to Dr. Jasbeck, who answered it in June 2011, after Dr. Garber had completed his. (Tr. at 614-21.) The form simply replicates Dr. Garber's assessments.

Dr. Stoler scribbled a brief narrative report in July 2011. (Tr. at 695.) Plaintiff's Crohn's disease was "presently as controlled as possible," he wrote, and "in relative remission at this time . . . ." (*Id.*) It was chronic, and "lifelong," he added. (*Id.*) The spondyloarthropathy was "not my area of expertise" and Dr. Stoler admitted he was "not qualified to comment on his limitations from this," deferring to the other doctors. (*Id.*)

Dr. Gupta, a state consultant, reviewed Plaintiff's records and constructed an RFC on July 19, 2011. (Tr. at 78-80.) He considered Plaintiff's daily activities and medication treatment history as the "most informative [factors] in assessing [Plaintiff's] credibility," which he found to be only partial. (Tr. at 78.) Despite Plaintiff's allegations, Dr. Gupta explained, his Crohn's disease was

"fairly well controlled" and he did not have joint synovitis or edema. (*Id.*) Thus, he concluded that Plaintiff could occasionally lift twenty pounds; frequently lift ten pounds; stand or walk for six hours in the workday; sit for six hours; and had unlimited ability to push and pull. (Tr. at 79.) He also suggested various postural limitations, such as occasional stooping and kneeling. (*Id.*)

Dr. Garber drafted a "Disability Narrative Report" on September 12, 2011. (Tr. at 685.) He mentioned Plaintiff had "generalized arthalgias/myalgias, presumably on the basis of his arthritic condition." (*Id.*) Dr. Garber conjectured that "[i]t is also quite possible that a large part of his generalized pain is from a central pain sensitivity syndrom (i.e. 'fibromyalgia')." (*Id.*) Appointments were scheduled every six months and, over the course of several years, Plaintiff's condition remained "essentially unchanged . . . ." (*Id.*) His "symptomatology" supported Plaintiff's argument that he could not work full-time. (*Id.*)

### 3.    Application Forms

Plaintiff completed a Function Report on July 21, 2011. (Tr. at 171-78.) In it, he contended that he could not sit, stand, lift objects, or walk for prolonged periods. (Tr. at 171.) During the day, he dressed, showered, watched television, and napped. (*Id.*) He did not take care of children or his dog; his wife fed and walked the dog. (Tr. at 172.) Pain and multiple trips to the bathroom disrupted his sleep. (*Id.*) He had no problems with personal care and he could prepare sandwiches, although this took several hours. (Tr. at 173.) Light housework, such as folding clothes and emptying the dishwasher, likewise took hours and, consequently, his wife did most of it, while his son completed the outdoor work. (Tr. at 173-74.) Plaintiff tried to leave the house once per day, generally by car, either as a driver or passenger; he could go out alone. (Tr. at 174-75.) He shopped for groceries once per week, though pain and frequent rest breaks made the trips stretch out over

several hours. (Tr. at 174.) A few times each month he visited friends and family, but he did not travel anywhere on a regular basis. (Tr. at 175.)

Plaintiff asserted difficulties with the following: lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, completing tasks, climbing stairs, and using his hands. (Tr. at 176.) He could sit for three hours, lift and carry up to twenty pounds, and walk 100 feet before taking a fifteen minute rest. (*Id.*) Interpersonal skills were not an issue, and he handled stress "fairly well." (Tr. at 176-77.) He wore a back brace when walking. (Tr. at 177.)

The record also shows an extensive work history. (Tr. at 144-57, 163.) From 1986 to 1988, Plaintiff installed cable television. (Tr. at 163.) Later, he worked as a warehouse supervisor, a broadband internet technician, a field technician for a cable television business, and as an installation supervisor in the same field. (Tr. at 30, 163.)

### 4.    Administrative Hearing

ALJ Gasparovich convened the administrative hearing on June 19, 2012. (Tr. at 26-57.) She began by explaining to Plaintiff that she was bound by the prior ALJ decision "absent a finding of a change of condition . . . ." (Tr. at 27.) Plaintiff confirmed his work history and testified that his last job ended in August 2009. (Tr. at 30-31.) Asked why he stopped working, Plaintiff responded that he was "physically unable to work." (Tr. at 31.) The ALJ pressed the issue, asking if he went "on a sick leave or a disability, or were you laid off?" (*Id.*) Plaintiff admitted he was terminated and subsequently collected unemployment benefits until around June 2011. (*Id.*)

Plaintiff staked his disability claim on his lower back pain and "extremely bad diarrhea issues . . . ." (*Id.*) The medications caused fatigue and nausea, but no regurgitation. (Tr. at 32.) The ALJ then questioned whether his condition had changed since the last hearing. (*Id.*) Plaintiff

24

replied, "Probably gained some weight and physically I haven't been active as much, so it's harder for me to–you know, to do as much as I could." (*Id.*)

Plaintiff's attorney then took over the questioning. (*Id.*) Plaintiff told her that his lower back hurt, even with medication, at level seven-out-of-ten on a VA scale; it edged up to level eight without medicine. (*Id.*) He could sit for "no more than five minutes, explaining that his abscess, "called a fistula cyst, . . . leaks and drains, and so it's tender down there. And between that and the diarrhea that I have, it's unfortunately raw all the time . . . ." (Tr. at 33.) He could stand for ten minutes before losing his breath and developing right leg numbness. (Tr. at 34.) A block was the farthest he could walk, and ten pounds the most he could lift. (*Id.*) Eight to ten times per night he rose from bed to use the restroom due to diarrhea. (Tr. at 35.) Three hours of sleep was all he could cobble together at night, supplemented by an hour or two of napping during the day. (*Id.*) He was in the bathroom with diarrhea about five times during the day. (Tr. at 38.) However, he later said that he slept well three days a week, usually, without waking up as frequently, depending on what he ate. (Tr. at 39-40.) In the last five years, he had not passed a night without getting up at least three or four times. (Tr. at 40.)

He lived with his wife and son in a one-story house, obviating any problems with stairs, which were difficult for him. (Tr. at 36.) With breaks, he could complete some chores, vacuuming, emptying the dishwasher, and cooking. (Tr. at 37.) He could also shop, usually with his wife; he avoided standing in line to pay, letting his wife stay while he went to the car. (*Id.*) He was inside the store for, at most, ten minutes, before going to the car, and he needed a back brace just to do that. (*Id.*) His wife and son handled yard work, but at the end of summer he liked to can vegetables

from their garden, sometimes spending the whole day–four to five hours, not including breaks–canning. (Tr. at 38.)

He still took Humira, an injectable medication that helped his bowel issues, back pain, and swelling. (Tr. at 39.) Also, his legs had recently begun to swell, possibly due to the heat; his doctor provided medications and recommended elevating his legs. (Tr. at 41.) The ALJ then asked how much weight Plaintiff had gained in the last year; about forty pounds, Plaintiff replied. (Tr. at 42.) The doctors recommended losing weight, and Plaintiff had attended physical therapy, though he thought that riding a stationary bicycle aggravated his perianal issues. (*Id.*)

The VE then questioned Plaintiff about his prior jobs to gauge their exertional levels. (Tr. at 45.) As a cable installer, he carried a twenty-eight foot ladder weighing about fifty pounds, climbed it while laden with twenty pounds of tools, then drilled into the buildings, sometimes navigating into crawlspaces. (Tr. at 45-46.) He trained others how to perform this work as well. (Tr. at 46.) The maximum weight he handled as a warehouse supervisor was also fifty pounds. (Tr. at 47-48.)

The VE next testified that Plaintiff's past occupations were classified as skilled, at either the medium or heavy exertional levels, which are categories the regulations use to measure the physical demands of different jobs. (Tr. at 48-49.) *See* 20 C.F.R. §§ 404.1567, 416.967. The ALJ then asked the VE to

> assume an individual who is currently 51 years old and possesses the same educational background and work experience as Mr. Erb. Assume the individual could lift 20 pounds occasionally and 10 pounds frequently, could sit for up to six hours of an eight-hour day, could stand for up to six hours of an eight-hour day, and could walk for six hours of an eight-hour day; could never use ladders, scaffolds, or ropes; could only occasionally bend, twist, and turn at the waist or the neck.

(Tr. at 49.) "Could such an individual perform any of Mr. Erb's past work either as is generally performed or as he performed it?" she asked. (*Id.*) Not as he performed it, the VE stated, but he could transfer his skills to other jobs. (Tr. at 49-50.) Particularly, his experience overseeing others and problem solving were valuable; she conjectured that they might translate to customer service jobs requiring him to instruct customers with malfunctioning products. (Tr. at 50.) For example, he could work as a customer service representative, (4000 positions in Michigan, 140,000 nationally), and a help desk representative, also called an information center specialist or a technical support specialist (1900 positions in southeast Michigan, 3500 in the state). (Tr. at 50-51.)

Adding additional limitations, the ALJ asked what jobs remained available if the individual above "could only stand and walk combined no more than six hours in an eight-hour day and would need a sit/stand option at will . . . [and count not] push or pull with the lower extremities." (Tr. at 51.) None of the jobs listed could be performed with the "sit/stand" option. (Tr. at 52.) However, the individual could work in production assembly, (1000 positions in southeast Michigan), inspection and sorting, (1000 positions in southeast Michigan), and packaging, (1500 positions in southeast Michigan). (Tr. at 52-53.) If, instead of these additional restrictions, the individual was unable to lift over ten pounds, the first set of jobs above remained viable. (Tr. at 53.) Alternatively, the need to shift between sitting, standing, and walking every fifteen to twenty minutes would preclude all of the positions. (Tr. at 53-54.) The VE explained that the second set of jobs were sedentary, so standing and sitting would not affect their availability, but the walking requirement would. (Tr. at 54.) While a few other jobs, such as security officers, included periodic walking, none allowed it every fifteen minutes. (Tr. at 54-55.) Nor would any position permit the

27

employee to take an unscheduled thirty- to forty-five-minute break at least once per day. (Tr. at 55.)

Plaintiff's attorney then asked if any jobs allowed an individual to "sit for up to three hours and stand and walk in combination for up to one hour total." (Tr. at 56.) There were not any such positions, the VE testified. (*Id.*) Neither would the individual find work if she needed to take three or more absences per month. (*Id.*)

### F.   Analysis and Conclusions

### 1.   Legal Standards

ALJ Gasparovich adopted the first ALJ's finding that during the time Plaintiff qualified for benefits, he had the RFC

> to perform light work as defined by 20 CFR 404.1567(b) except as follows: he can lift 20 pounds occasionally and 10 pounds frequently; he can sit for six hours of an eight-hour work day; he can stand for six hours of an eight-hour work day; he can walk for six hours of an eight hour work day; he can never use ladders, scaffolds or ropes; he can occasionally use ramps, use stairs, stoop, knee[l], crouch, crawl, or balance; and he can occasionally bend, twist, and turn at the waist or neck.

(Tr. at 67.) Light work

> involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. §§ 404.1567(b), 416.967(b).

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

2.      **Substantial Evidence**

a.      *Plaintiff's Motion*

Plaintiff's first argues that the ALJ improperly devalued opinions from the treating sources, leading to a flawed RFC. (Doc. 10 at 12.) As both parties realize, however, the issue is not as simple as a straightforward application of the treating source rule. Instead, each side grapples with the *res judicata* effect of the prior ALJ decision. Plaintiff's gives an apt summary of the law, explaining that under Sixth Circuit precedent an ALJ can reject a previous RFC only if she finds new and material evidence that the claimant's condition later worsened. (*Id.* at 13-14.)

He then lambastes the present decision: "For the ALJ to conclude there was no new and material evidence to document a worsening of Mr. Erb's conditions borders on ludicrous." (*Id.* at 14.) The previous ALJ indicated there were no medical opinions available, (*Id.*; Tr. at 66), instead basing his decision on Plaintiff's daily activities, alcohol use, and receipt of unemployment benefits. Now, however, Plaintiff testified that his daily life was sedentary, he had ceased drinking, and did not receive any unemployment benefits during the current claimed disability period. (Doc. 10 at 15.) Moreover, the present record lacks any files from the first records, and "[t]hus it is hard to see how the ALJ could make an accurate comparison" of the two periods. (*Id.*)

Proceeding to the core argument, Plaintiff thrashes the ALJ's handling of the medical opinions. (*Id.* at 16.) First, the ALJ blithely credited the non-examining consultant's opinion. (*Id.*) Yet, the consultant reviewed a limited portion of the current record and none of the evidence from the first decision. (*Id.*) More damaging still, the ALJ improperly used this opinion to trump treating sources. (*Id.* at 16-17.) Plaintiff then explains why those treating sources–Dr. Stoler, Dr. Garber, and Dr. Jasbeck–should have received greater weight. (*Id.* at 18-21.) Each developed their opinions

after "appropriate clinical and diagnostic testing." (*Id.* at 19.) Next, Plaintiff reiterates that the consultant's opinion, which he labels as the only "contradictory evidence in the record," could not outweigh these physicians. (*Id.*) Finally, the ALJ did not evaluate the opinions utilizing the factors in 20 C.F.R. § 404.1527.

Plaintiff's second main argument asserts the ALJ mangled the credibility analysis. (Doc. 10 at 21.) Plaintiff had more clinical abnormalities than the ALJ acknowledged, he points out, and none of the records support the ALJ's conclusion that dietary tweaks could sufficiently manage his disease. (*Id.* at 22-23.) Also, the doctors' vague statements that Plaintiff's conditions were controlled "say nothing about his ability to work." (*Id.* at 23.) He concludes by noting his lengthy work history is another factor the ALJ disregarded. (*Id.* at 24.)

b.   *Defendant's Motion*

Defendant's *res judicata* analysis accentuates an aspect Plaintiff underplays: The claimant must demonstrate her condition "worsened" after the prior decision. (Doc. 14 at 11-12.) On this point, Plaintiff's case crumbles, according to Defendant. The opinions Plaintiff arrays lay down limitations exceeding the prior ALJ's, but this alone fails to prove the necessary retrogression. (*Id.*) In fact, those opinions seed Plaintiff's failure, for each physician dated the limitations' onset several years before the last ALJ's denial. (*Id.*) If Plaintiff labored under the same restrictions then as now, he had not worsened. If anything, the records traced progress, or at least showed stasis, in Plaintiff condition. (*Id.* at 14.) As the ALJ highlighted, the opinions cast Plaintiff's conditions as "controlled." (*Id.*) Defendant argues that Plaintiff misconceives how these statements are relevant, contending that regardless of whether they prove he could work, they show he had not worsened (*Id.*) The arguments to the contrary conceal Plaintiff's misdirected attack against the wrong

decision: the findings from 2010, rather than 2012. (*Id.* at 15.) But *res judicata* renders that decision into an incontestable baseline used only to measure whether Plaintiff's condition deteriorated. Thus, Defendant concludes the ALJ reasonably analyzed the evidence to find no such worsening. (*Id.*)

Further, Defendant claims that the ALJ canvassed the record, finding evidence that refutes the impairments' alleged severity. (*Id.* at 13.) For example, the ALJ cited evidence that the February and March 2011 procedures proved effective, that the frequent diarrhea began to taper, and that Plaintiff's diet influenced the intensity of the diarrhea. (*Id.*) Also, the ALJ found little proof that Plaintiff had "active inflammatory disease," and the physical examinations turned up nothing other than "some limited range of motion in the spine." (*Id.*) Other causes, such as obesity, possibly explained the back pain. (*Id.* at 13-14.) Dr. Gupta's opinion adds further support, Defendant asserts, and the ALJ followed regulations calling consultants "experts," 20 C.F.R. § 404.1527(e)(2)(i), and Sixth Circuit precedent suggesting these experts' opinions could top those of treating physicians. (*Id.* at 15 (citing *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 651 (6th Cir. 2006)).

Defendant also contests Plaintiff's credibility argument, citing the significant deference owed to the ALJ on this point. (Doc. 14 at 16.) Defendant references the above analysis and adds that Plaintiff's weight, one of the only changes in his condition that he could come up with at the hearing, stayed steady at 313 pounds from March to October 2011. (*Id.*)

     c.   *Plaintiff's Reply*

Plaintiff's rely brief confirms that he is attacking the 2010 findings, but argues that this is permissible under the *res judicata* analysis. (Doc. 15 at 1-2.) In particular, he writes that

31

a change in circumstances does not mean only a significant decline in a claimant's functioning, but also includes a change in the state of the available evidence. It would make little sense to apply administrative *res judicata* to a situation where the record was inadequately developed at the time of the first decision, but new and material evidence established that the claimant was disabled. . . . The ALJ could not summarily adopt the RFC from the first ALJ based on a conclusion the record did not document a worsening of Mr. Erb's conditions when the record was markedly undeveloped in the first proceedings. . . . The Commissioner cannot logically argue that Plaintiff's condition has not gotten worse when there was no initial baseline. The evaluations from the treating sources are new and material because they establish this baseline.

(*Id.*) In other words, the opinions are valid as "new and material" evidence not because they need to show his condition deteriorated, which Plaintiff never explicitly states, but rather because his condition was initially worse than the first ALJ realized and new records bear this out. (*Id.*) Plaintiff does not heap many case citations onto this analysis.

To support the proposition that the development of "new and material" evidence is a change in circumstances under *Drummond*, 126 F.3d at 842, Plaintiff cites only the Commissioner's Acquiescence Rulings adopting that opinion. (*Id.* at 1.) The relevant ruling stated that the prior decision remained binding in a subsequent period "unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding . . . ." Acquiescence Ruling ("AR") 98-4(6), 63 Fed. Reg. 29771, 29773, 1998 WL 283902 (June 1, 1998) (acquiescing to *Drummond*, 126 F.3d 837). The implication of Plaintiff's argument is that he infers from AR 98-4(6) that the "new" evidence does not have to document Plaintiff's worsening conditions, but rather by virtue of its recency can itself constitute the changed circumstances necessary to unbind the ALJ from the first decision. (*Id.* at 1-2.)

Finally, Plaintiff argues that the Defendant's analysis of the medical evidence is an impermissible post hoc rationalization that appears nowhere in the ALJ's decision. (*Id.* at 2-3.) He

relies on the rule the Supreme Court enunciated in *S.E.C. v. Chenery*, 318 U.S. 80, 89 (1943) (hereinafter "*Chenery I*"), prohibiting an agency from utilizing new grounds in court to justify its action when it did not rely on those grounds to make the original decision at issue. *See S.E.C. v. Chenery*, 332 U.S. 194 (1947) (hereinafter "*Chenery II*"). According to Plaintiff, the ALJ here did little more than "simply conclude[] that the record did not show Mr. Erb's condition worsened since the time of the previous ALJ's decision without further details as to how he reached this conclusion or why the new and material evidence was not relevant." (*Id.* at 2-3.) Thus, he contends that the court cannot consider Defendant's arguments. (*Id.* at 3.)

### d.    *Res Judicata*

The initial task facing the Court is to clarify how *res judicata* applies to the case and what Plaintiff needed to demonstrate in order to evade its strictures. Contrary to Plaintiff's argument, administrative *res judicata* in this Circuit binds subsequent ALJs unless the claimant provides evidence documenting a worsening condition. It does not suffice to offer evidence aimed at undermining the first ALJ decision by showing the original baseline was worse than that ALJ realized. The analysis requires the claimant to trace how his condition fared from after the first decision until the present. However, and again contrary to Plaintiff, the second ALJ does not need to review the evidence from the first record to make this comparison.

In the Sixth Circuit, a prior decision by the Commissioner can preclude relitigation in subsequent cases:

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a

finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

AR 98-4(6), 1998 WL 283902, at *3 (acquiescing to *Drummond*, 126 F.3d 837). The regulations also explicitly invoke *res judicata*: An ALJ can dismiss a hearing request where "res judicata applies in that we have made a previous [final] determination or decision under this subpart about your rights." 20 C.F.R. §§ 404.957, 416.1457. Collateral estoppel is the branch of *res judicata* applied in this context. As the Third Circuit explained, *res judicata* formally "consists of two preclusion concepts: issue preclusion and claim preclusion." *Purter v. Heckler*, 771 F.2d 682, 689 n.5 (3d 1985); *see also Groves v. Apfel*, 148 F.3d 809, 810 (7th Cir. 1998) (Posner, J.) (discussing the "collateral estoppel branch of *res judicata*" in Social Security cases). Claim preclusion prevents renewing a judgment on the same cause of action; issue preclusion, or collateral estoppel is less expansive, "foreclosing relitigation on all matters that were actually and necessarily determined in a prior suit." *Id.*

The *res judicata* effect of past ALJ decisions is actually a form of collateral estoppel precluding reconsideration of discrete factual findings and issues. *See Brewster v. Barnhart*, 145 F. App'x 542, 546 (6th Cir. 2005) ("This Court will apply collateral estoppel to preclude reconsideration by a subsequent ALJ of factual findings that have already been decided by a prior ALJ when there are no changed circumstances requiring review.").[4] The Commissioner's internal guide explains the different issues and factual findings precluded by *res judicata* under

---

[4] The Sixth Circuit has not decided "whether a party asserting collateral estoppel in a Social Security case . . . must establish the traditional elements of collateral estoppel." *Brewster*, 145 F. App'x at 547. *See also Caudill v. Comm'r of Soc. Sec.*, 424 F. App'x 510, 514-15 (6th Cir. 2011) (suggesting that the elements do not apply); *id.* at 519-21 (White, J., dissenting in part) (noting that Sixth Circuit unpublished decisions and other authority "strongly suggest that traditional rules of collateral estoppel should apply to the decisions of ALJs in social security disability cases"); *Rogers v. Comm'r of Soc. Sec.*, 225 F.3d 659, 2000 WL 799332, at *4 (6th Cir. 2000) (applying one of the elements in a Social Security case).

*Drummond*. Soc. Sec. Admin., *Hearings, Appeals, and Litigation Law Manual*, § I-5-4-62, 1999 WL 33615029, at *8-9 (Dec. 30, 1999) (hereinafter "*Hallex*"). These include the RFC and various other findings along the sequential evaluation process, such as "whether a claimant's work activity constitutes substantial gainful activity," or whether she meets or equals a listing. *Id.*

Evidence of "changed circumstances" after the prior decision allows the ALJ to make new findings concerning the unadjudicated period without disturbing the earlier decision. *See Bailey ex rel. Bailey v. Astrue*, No. 10-262, 2011 WL 4478943, at *3 (E.D. Ky. Sept. 26, 2011) (citing *Drummond*, 126 F.3d at 842-43). In other words, even though the first ALJ did not make any findings concerning later periods, her decision still applies to those periods absent the requisite proof. Thus, as applied in this Circuit, the AR 98-4(6) and *Drummond* essentially create a presumption that the facts found in a prior ruling remain true in a subsequent unadjudicated period unless "there is new and material evidence" on the finding. *See Makinson v. Colvin*, No. 5:12CV2643, 2013 WL 4012773, at *5 (N.D. Ohio Aug. 6, 2013) (adopting Report & Recommendation) ("[U]nder *Drummond* and AR 98-4(6), a change in the period of disability alleged does not preclude the application of *res judicata*.") (citing *Click v. Comm'r of Soc. Sec.*, No. 07-13521, 2009 WL 136890, at *4 (E.D. Mich. Jan. 16, 2009))); *cf. Randolph v. Astrue*, 291 F. App'x 979, 981 (11th Cir. 2008) (characterizing the Sixth Circuit's rule as creating a presumption); *Chavez v. Bowen*, 844 F.2d 691, 693 (9th Cir. 1988) ("The claimant, in order to overcome the presumption of continuing nondisability arising from the first administrative law judge's findings of nondisability, must prove 'changed circumstances' indicating a greater disability." (quoting *Taylor v. Heckler*, 765 F.2d 872, 875 (9th Cir. 1985))).

35

In *Drummond*, for example, the court held that the first ALJ's RFC applied to a subsequent period unless the circumstances had changed. 126 F.3d at 838-39, 843. *See also Priest v. Soc. Sec. Admin.*, 3 F. App'x 275, 276 (6th Cir. 2001) (noting that in order to win benefits for a period after a previous denial, the claimant "must demonstrate that her condition has so worsened in comparison to her condition [as of the previous denial] that she was unable to perform substantial gainful activity"); *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1232-33 (6th Cir. 1993) (same). The Sixth Circuit made this clear in *Haun v. Commissioner of Social Security*, rejecting the argument that *Drummond* allowed a second ALJ to examine *de novo* the unadjudicated period following the first denial. 107 F. App'x 462, 464 (6th Cir. 2004).

To overcome the presumption that the claimant remains able to work in a subsequent period, the claimant must proffer new and material evidence that her health declined. The Sixth Circuit has consistently anchored the analysis on the comparison between "circumstances existing at the time of the prior decision and circumstances existing at the time of the review . . . ." *Kennedy v. Astrue*, 247 F. App'x 761, 768 (6th Cir. 2007). In a case predating *Drummond*, the court explained, "[W]hen a plaintiff previously has been adjudicated not disabled, she must show that her condition so worsened in comparison to her earlier condition that she was unable to perform substantial gainful activity." *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1232-33 (6th Cir. 1993). Later, it reiterated, "In order to be awarded benefits for her condition since [the previous denial], Priest must demonstrate that her condition has . . . worsened in comparison to her [previous] condition . . . ." *Priest*, 3 F. App'x at 276. The ALJ must scan the medical evidence "with an eye toward finding some change from the previous ALJ decision . . . ." *Blackburn v. Comm'r of Soc. Sec.*, No. 4:11-cv-58, 2012 WL 6764068, at *5 (E.D. Tenn. Nov. 14, 2012), *Report*

36

& *Recommendation adopted by* 2013 WL 53980, at *1 (E.D. Tenn. Jan. 2, 2013). That is, the evidence must not only be new and material, but also must show deterioration. *Drogowski v. Comm'r of Soc. Sec.*, No. 10-12080, 2011 WL 4502988, at *8 (E.D. Mich. July 12, 2011), *Report & Recommendation adopted by* 2011 WL 4502955, at *4 (E.D. Mich. Sept. 28, 2011). In *Drogowski*, for example, the court rejected the plaintiff's argument that a report met this test simply because it was not before the first ALJ. *Id.* at *2, 8-9. These decisions make clear that the relevant change in circumstances is not "a change in the state of the available evidence," as Plaintiff contends, (Doc. 15 at 1), but a change in Plaintiff's condition.

Moreover, the second ALJ does not need to review the record from the first claim. Plaintiff cites, (Doc. 10 at 15-16), a Second Circuit case to suggest that the ALJ erred by not acquiring the first set of records. *See Veino v. Barnhart*, 312 F.3d 578 (2d Cir. 2002). That case dealt with a distinct situation the regulations directly address and which bears only a facile resemblance to the current case: determining when a recipient of benefits subsequently improves such that they no longer qualify for disability. *Id.* at 580, 586. The court cited regulations that mandated examining the "'symptoms, signs and/or laboratory findings associated with [the] . . . impairments'" in order to decide that the claimant's condition had improved. *Id.* at 586 (citing 20 C.F.R. § 404.1594(b)(1)). Finding that the ALJ did not include the prior records as exhibits, or explicitly review them in the decision, the Second Circuit rejected the improvement analysis. *Id.* at 587. The court did not believe that the Commissioner could fulfill her duties under the regulation without scrutinizing the previous evidence. *Id.*

Unlike the improvement issue in *Veino*, the regulations do not instruct ALJs facing *res judicata* to examine specific medical evidence from the prior case file. Additionally, the Sixth

Circuit has rejected claims that the ALJ must do so. In *Collier v. Commissioner of Social Security*, the court suggested the presence of the old file was unnecessary. 108 F. App'x 358, 362-63 (6th Cir. 2004). There, the first record was lost and the plaintiff argued that "the Commissioner's failure to produce this earlier case file prevented the ALJ from applying the principles articulated in *Drummond* . . . ." *Id.* at 362. The district found that the new evidence sufficed to show improvement, justifying a change in the RFC. *Id.* at 363. The Sixth Circuit likewise found that the evidence from after the first decision provided "substantial evidence" to support the second RFC. *Id.* Similarly, the court found no error where the ALJ declined to consider a report from the claimant's treating physician submitted with his first application. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 687 (6th Cir. 1992). The Commissioner argued that "the ALJ need not consider this report because it related to plaintiff's condition prior to his alleged onset date of disability . . . ." *Id.* Agreeing with the Commissioner, the court noted that because *res judicata* applied , "the ALJ was not required to consider . . . [the] report." *Id.* A court in this District thus dismissed as "unpersuasive" a claim that "the current ALJ was obligated to obtain the record from his previous administrative hearing,"questioning "what the current ALJ would have learned from . . . the previous administrative record." *Slick v. Comm'r of Soc. Sec.*, No. 07-13521, 2009 WL 136890, at *5 (E.D. Mich. Jan. 16, 2009). It was enough that the ALJ read and considered the first ALJ's findings. *Id.*

The Commissioner's guide also absolves the ALJ from reviewing the prior record. *Hallex*, § I-5-4-62, 1999 WL 33615029, at *15-16. ALJs only need to obtain a copy of the previous decision: "It may be possible to apply the [acquiescence ruling] if the adjudicator can obtain a copy of the final ALJ or [Appeal Council] decision on the prior claim." *Id.* at *15. The ALJ can then

38

"review the description of the pertinent evidence in the ALJ's or AC's decision to determine the evidence on which the ALJ or AC based a prior finding(s)," and must compare "this evidence" to the newly submitted materials. *Id.* The prior record is dusted off and consulted only if "additional development . . . may be of assistance . . . ." *Id.* Therefore, dredging up the old evidence is unnecessary to craft a sufficient comparison.

The necessary argument, then, has nothing to do with whether the initial decision was sound enough to create a valid baseline. The second ALJ must accept that initial baseline regardless of its persuasiveness. Nor can the claimant dislodge it by proffering subsequently created evidence that calls it into question. "There is no exception to *res judicata* when the party that lost the original decision uncovers new evidence." *Hawley v. Comm'r of Soc. Sec.*, No. 01-74196, 2003 WL 1120159, at *2 (E.D. Mich. Feb. 3, 2003). Indeed, the nature and purpose of *res judicata* is to put a decision beyond dispute, and the Commissioner and the courts recognize that they are bound by good and bad decisions alike. The Administration's internal regulations require ALJs to adopt a prior finding even when "it was based on an error on the face of the evidence," unless the decision can be reopened. *Hallex*, § I-5-4-62, 1999 WL 33615029, at *11. This Court has held that "errors or inconsistencies" in the first decision "do not lessen its binding effect. The bar of *res judicata* does not only apply to good decisions." *Jackson v. Apfel*, 74 F. Supp. 2d 698, 700 (E.D. Mich. 1999). Thus, evidence that merely suggests the "plaintiff's condition may have been misdiagnosed during the prior claim period" will not prove it worsened in the new period. *Drogowski*, 2011 WL 4502988, at *9. In other words, attacks on even ill-founded prior decisions are misdirected and do not unbind the second ALJ.

Plaintiff's limited argument addressing these matters hinges on AR 98-4(6). (Doc. 10 at 14; Doc. 15 at 1-2.) Though it purports to adopt and implement *Drummond*, AR 98-4(6) seems to veer slightly from that case. The Ruling's operative language omit's *Drummond*'s focus on the claimant's worsening condition. Instead, it states that *res judicata* does not apply in two circumstances: (1) Where "new and material evidence" relates to a prior finding; or (2) where the law affecting a finding has changed. AR 98-4(6), 1998 WL 283902, at *3. Plaintiff thus emphasizes that the opinions here are "new and material," and they certainly relate to the prior finding. (Doc. 10 at 14; Doc. 15 at 1-2.) He does not ignore the need show retrogression, but nonetheless relies heavily on the "new and material" standard.

However, the Ruling proves to be a rickety structure unable to support Plaintiff's claim. First, Acquiescence Rulings do not bind courts, particularly when they appear to conflict with the underlying opinion to which the Commissioner acquiesces. *See St. James v. Comm'r of Soc. Sec.*, No. 13-10574, 2014 WL 1305032, at *11 (E.D. Mich. Feb. 4, 2014) (Report & Recommendation) ("To the extent any confusion exists regarding the applicable standard, *Drummond* trumps the acquiescence ruling."); *McClain v. Comm'r of Soc. Sec.*, No. 12-11172, 2013 WL 5182089, at *11 (E.D. Mich. Sept. 13, 2013) (Report & Recommendation) (same); *Jackson*, 74 F. Supp. 2d at 700 n.3 ("The Commissioner's Acquiescence Rulings do not control how or when . . . Sixth Circuit precedent becomes controlling," and do not bind the court or the Commissioner.); *see also* 20 C.F.R. §§ 404.985(c), 416.1485(c) (listing the circumstances in which the Commissioner will disregard the ruling and relitigate the issue acquiesced to). Moreover, courts have highlighted the apparent inconsistency between *Drummond* and AR 98-4(6). One court questioned "whether AR 98-4(6) is fully consistent with *Drummond* since AR 98-4(6) does not use the phrase 'improvement

in a claimant's condition' when instructing ALJs how to apply *Drummond*." *Harris v. Astrue*, No. 3:09cv00260, 2010 WL 3909495, at *5 (S.D. Ohio May 21, 2010), *Report & Recommendation adopted by* 2010 WL 3909493, at *2 (S.D. Ohio Sept. 29, 2010); *see also St. James*, 2014 WL 1305032, at *11 (same); *McClain*, 2013 WL 5182089, at *11 (same). If they are contradictory, then *Drummond* trumps the Ruling.[5]

Thus, the issue before the Court is whether Plaintiff has offered substantial evidence that after the 2010 decision his condition worsened enough to find him disabled. The second ALJ did

---

[5] The term, "material," as used in the Ruling, is defined in the Commissioner's internal guidelines, the HALLEX, and provides further indications that the AR contradicts *Drummond*. *Hallex*, § I-5-4-62, 1999 WL 33615029, at *7. "Material" evidence are facts that relate to either the period adjudicated by the prior claim, or the subsequent, unadjudicated period being considered in the present claim, and which warrant a finding different from the prior claim. *Id.* As an example, the Commissioner states that the evidence could "relate to both the unadjudicated period and the period previously adjudicated, e.g., new evidence establishes that, prior to the date of the final decision on the prior claim and continuing to the present time, the claimant's RFC was, and continues to be, more restrictive than that found in the prior decision." *Id.* But as discussed above, the Sixth Circuit has clearly stated the deterioration must occur after the prior decision, not before it.

If the prior decision was mistaken, different regulations provide potential relief. The HALLEX hints at this by suggesting that when the RFC was "more restrictive than that found in the prior decision" the ALJ may be able to reopen that decision. *Id.* Reopening can occur under the conditions set out in 20 C.F.R. §§ 404.987, 404.992, 416.1487, 416.1492. These regulations provide explicit standards to determine whether an attack on a prior decision can proceed. The proper view, then, is that arguments against prior decisions should channel through these regulations, not the separate exception laid out in *Drummond* that specifically applies to periods after the prior decision. This view finds support in numerous cases that characterize the reopening provisions as a separate exception to *res judicata*. *See Purter*, 771 F.2d at 693 (characterizing the regulations as "equitable exceptions to administrative *res judicata*"); *Hunt v. Weinberger*, 527 F.2d 544, 548 (6th Cir. 1975) (noting these "regulations provide for a relaxation of the res judicata doctrine").

A court in this District has indicated this mode of analysis. In *Hawley v. Commissioner of Social Security*, the plaintiff's first claim was denied in 1999. 2003 WL 1120159, at *2. During his second case, he offered evidence that he had been unable to work since 1996, a period the first decision covered. *Id.* The court noted that the evidence was "irrelevant" because it did not indicate deterioration after 1999. *Id.* at *3. It noted, however, that the plaintiff could seek reopening based on that evidence. *Id.* Thus, evidence relating to the adjudicated period that suggests Plaintiff was then disabled is "irrelevant" to the *Drummond* exception. The reopening regulations lay the proper path for those arguments.

Here, Plaintiff did not request reopening and the parties have not broached that subject. Reopenings can occur constructively, *Gay v. Comm'r of Soc. Sec.*, 520 F. App'x 354, 358 (6th Cir. 2013), but the reopening decision is unreviewable unless it implicates a colorable constitutional issue. *Califano v. Sanders*, 430 U.S. 99, 108-09 (1977).

41

not need the prior record. *See Slick*, 2009 WL 136890, at *5; *Hallex*, § I-5-4-62, 1999 WL 33615029, at *15-16. It is evident from her opinion that she read and considered the first decision. (Tr. at 13; *see also* Tr. at 27.)

    e.    *Governing Standards for Medical Sources and Plaintiff's Credibility*

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B); *accord* 20 C.F.R. §§ 404.1520(a)(3), 416.920(a)(3); *Wyatt*, 974 F.2d at 683. The regulations carve the evidence into various categories, but the only relevant distinction for present purposes is between "acceptable medical sources" and "other sources." 20 C.F.R. §§ 404.1513, 416.913. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* §§ 404.1513(a), 416.913(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* §§ 404.1513(d), 416.913(d). There are important differences between the two types of sources. For example, only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2.

Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. §§ 404.1527, 416.927. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets

42

the statutory definition of disability and how to measure his or her RFC. *Id.* §§ 404.1527(d),

416.927(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical

opinions from acceptable sources, including treating opinions not given controlling weight, 20

C.F.R. §§ 404.1527(c), 416.927(c), and the ALJ should use the same analysis for "other source"

opinions as well. *See Cruse*, 502 F.3d at 540-42; SSR 06-3p, 2006 WL 2329939, at *2. The test

looks at whether the source examined the claimant, "the length of the treatment relationship and

the frequency of examination, the nature and extent of the treatment relationship, supportability

of the opinion, consistency of the opinion with the record as a whole, and specialization of the

treating source." *Wilson*, 378 F.3d at 544. *See also* 20 C.F.R. §§ 404.1527(c), 416.927(c).

Certain opinions of a treating physician, in contrast, receive controlling weight if they are

"well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are

"not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§

404.1527(d)(2), 416.927(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to

dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. §§

404.1527(d), 416.927(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe

a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d),

416.927(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance

to the source of an opinion[, including treating sources]," regarding whether a person is disabled

or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the

application of vocational factors. *Id.* §§ 404.1527(d)(3), 416.927(d)(3).

43

Additionally, a physician's "notation in his notes of a claimed symptom or subjective complaint from the patient is not medical evidence; it is the 'opposite of objective medical evidence.' . . . An ALJ is not required to accept the statement as true or to accept as true a physician's opinion based on those assertions." *Masters v. Astrue*, 818 F. Supp. 2d 1054, 1067 (N.D. Ill. 2011) (quoting *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010)). "Otherwise, the hearing would be a useless exercise." *Id. See also Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011) (noting that there was no medical opinion in "Dr. Kllefer's pain-related statement . . . [because] it merely regurgitates Francis's self-described symptoms"); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 156 (6th Cir. 2009) ("[S]ubstantial evidence supports the ALJ's determination that the opinion of Dr. Boyd, Poe's treating physician, was not entitled to deference because it was based on Poe's subjective complaints, rather than objective medical data.").

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). *See also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. For example, an ALJ can properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec. of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273, 1995 WL 138930, at *1 (6th Cir. 1995) (unpublished table decision). "This requirement is not simply a formality; it is to safeguard the claimant's procedural rights." *Cole*, 2011 WL 2745792,

at *4. "[A] failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

When a disability determination that would be fully favorable to a claimant cannot be made solely on the basis of the objective medical evidence, an ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner*, 375 F.3d at 390. However, "[i]f an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky,* 35 F.3d at 1036.

The social security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. §§ 404.1529, 416.929; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. §§ 404.1529, 416.929; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky*, 35 F.3d at 1038-39; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986). The ALJ ascertains

45

the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "'objective evidence of the pain itself'" is not required, *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweicker*, 749 F.2d 1066, 1071 (3d Cir. 1984)), a claimant's description of his physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. §§ 404.1528(a)., 416.928(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)    [D]aily activities;

(ii)   The location, duration, frequency, and intensity of . . . pain;

(iii)  Precipitating and aggravating factors;

(iv)  The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)   Treatment, other than medication, . . . received for relief of . . . pain;

(vi)  Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). *See also Felisky*, 35 F.3d at 1039-40; SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of her subjective statements are also relevant. 20 C.F.R. §§ 404.1527(c), 416.927(c); SSR 96-7p, 1996 WL 374186, at *5.

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers*, 486 F.3d at 247. *See also Cruse*, 502 F.3d at 542 (noting that the "ALJ's credibility determinations about the claimant are to be given great

weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."))); *Jones*, 336 F.3d at 475 ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely on an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

f.  *Analysis*

The ALJ adequately considered the newly submitted evidence and determined Plaintiff's condition had not deteriorated. First, it should be noted that the medical record is deceptively thick. Of the nearly 530 pages of records before the ALJ, (Tr. at 202-731), 343 pages address three days: Plaintiff's February drainage procedure (really two days, as he stayed the night); his February 19 emergency room visit; and his March examination. (Tr. at 204-547.) These brim with the sort of medical minutia–medication dosages, raw laboratory data, copies of past records, boilerplate forms, and the like, (*see, e.g.*, Tr. at 206-16, 218, 236, 238, 241)–useful to hospital staff but largely irrelevant to a disability determination. The remainder of the record is replete with duplicate reports and forms. *See, e.g.*, (Tr. at 300, 623, 677, 687, 690, 691, 693, 696.) Excising these shortens the record considerably.

Plaintiff's arguments against the opinion analysis might be better taken if the ALJ had reviewed the record fresh, without a binding prior decision looming over it. Crediting a non-examining consultant, despite his status as an expert, 20 C.F.R. § 404.1527(e)(2)(i), over three

47

treating sources is rare and would raise concerns in a typical case. (Tr. at 18-19.) Defendant's citations to *Blakley* provides only ambiguous support for the ALJ's action. (Doc. 14 at 15.) The Sixth Circuit there stated that "the ALJ's decision to accord greater weight to state agency physicians over Blakley's treating sources was not, by itself, reversible error." *Blakley*, 581 F.3d at 409. Supporting the court's statement, SSR 96-6p acknowledges, "In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources." 1996 WL 374180, at *3 (cited in *Blakley*, 581 F.3d at 409). The Ruling's lone example of an appropriate circumstance–the same circumstance absent in *Blakley*–was where the consultant reviewed a more comprehensive record than was available to the treating source. *Blakely*, 581 F.3d at 409; SSR 96–6p, 1993 WL 374180, at *3.

Plaintiff contends that the consultant here, Dr. Gupta, relied on a limited record, so his opinion cannot trump the treaters' statements. (Doc. 10 at 16-17.) Plaintiff oversells his case. First, as noted, his complaint that the consultant did not review the prior record does not raise a serious issue; the Commissioner can rely on the first ALJ's decision without rehashing the underlying evidence. *See Slick*, 2009 WL 136890, at *5; *Hallex*, § I-5-4-62, 1999 WL 33615029, at *15-16. Next, Plaintiff's recitation of the evidence Dr. Gupta reviewed is incomplete. (Doc. 10 at 16.) He cites to the page in the report listing a portion of the "Findings of Fact an Analysis of Evidence" section. (*Id.* (citing Tr. at 77).) Directly preceding that section, however, is a two page list of the "Evidence of Record" that seems to span almost the complete roster of the ALJ's exhibits, (Tr. at 22-24), stretching from November 2010 to July 2011. (Tr. at 73-76.) It is not immediately apparent

48

that Dr. Gupta lacked these other records that he failed to specifically write about in the "Analysis" section.

Regardless of the usual infrequency with which consultants outstrip treating sources, this is not the typical case. The ALJ could not take a holistic view of the evidence and find Plaintiff disabled if the record showed disability at any single point in time. The narrow question she had to ask of the record was whether it showed deterioration subsequent to the first decision. Her determination that it did not is well supported. As the ALJ observed, Plaintiff's main impairment, Crohn's disease, was first diagnosed in 2004, long before the prior decision. (Tr. at 17, 718.) Moreover, the weight of the numbers that Plaintiff pushes–three treating sources against one non-examiner–is undercut somewhat by Dr. Jasbeck's heavy reliance on Dr. Garber's opinion. Dr. Jasbeck's "To Whom it May Concern" letter referenced only Dr. Garber's treatment and opinions, simply stating that he concurred. (Tr. at 640.) His form opinion repeated Dr. Garber's; as the ALJ pointed out, it was "essentially identical, almost word for word . . . ." (Tr. at 18, 605-12, 614-21.) Dr. Jasbeck no doubt thoughtfully treated Plaintiff and his opinion should not be thrown out merely because it matches Dr. Garber's; but the evidence that he leaned on Dr. Garber suggests a hastily crafted opinion.

The ALJ carefully parsed the treating source opinions on which Plaintiff relies. (Tr. at 18-19.) She listed their contents and analyzed their weaknesses. (*Id.*) For example, she noted that Dr. Stoler hedged his last opinion, disclaiming any expertise on spondyloarthropathy and admitting he was "not qualified to comment on his limitations from this . . . ." (Tr. at 19 n.1, 695.) Yet, in his prior statement laying out the limitations, Dr. Stoler did comment on the arthropathy and joint pain to help explain his answers. (Tr. at 569-70.)

49

Critically, each of the treating sources dated the onset of Plaintiff's present limitations as well before the prior decision. (Tr. at 573, 611, 620.) Dr. Stoler said that 2004 was "the earliest date that the description of symptoms and limitations in this questionnaire applies." (Tr. at 573.) Posed the same question, both Dr. Garber and Dr. Jasbeck determined that 2005 was "the earliest date that the description of symptoms and limitations in this questionnaire applies." (Tr. at 611, 620.) Each thus asserted that the limitations they crafted, the restrictions Plaintiff currently labored under, began years before the first decision. Other courts have considered such evidence convincing when determining the claimant did not worsen. *See Drogowski*, 2011 4502955, at \*3 (noting that physician, in his opinion, stated there were no major changes in the plaintiff's condition); *Hawley*, 2003 WL 1120159, at \*3 (same); *cf. Price v. Comm'r of Soc. Sec.*, No. 2:12-15209, 2013 WL 6549657, at \*9-10 (E.D. Mich. Dec. 13, 2013) (adopting Report & Recommendation) (noting that the medical source opined the claimant's condition had worsened). In *Hawley*, the court went so far as to call a similar opinion "irrelevant" when it "report[ed] limitations that had been in effect since at least 1996 and thus indicate[ed] no change in Hawley's status after 1999," the date of the prior decision. 2003 WL 1120159, at \*3.

The only indication that any treating source thought Plaintiff worsened was Dr. Stoler's brief comment to that effect before the February procedure, (Tr. 539, 598); but that statement's weight was subsequently nullified when he observed, after the surgery and in one of the final medical records, that Plaintiff had "clinically improved . . . ." (Tr. at 690, 696.) Consequently, the opinions may have been "new" under the Commissioner's expansive interpretation of that term since they post-dated the first decision; but they were not "material" because they fail to warrant a finding that Plaintiff's health retrogressed. *Hallex*, § I-5-4-62, 1999 WL 33615029, at \*7.

The ALJ also mentioned the numerous treating sources who, along with Plaintiff himself, said he was "well" and his conditions were "controlled" or in "remission." (Tr. at 695, 721, 729.) Plaintiff protests that the terms "well" and "controlled" "say nothing about his ability to work." (Doc. 10 at 23.) He appends a string of citations to bolster the statement. (*Id.*) Indeed, the cases support his claim. The problem for Plaintiff, however, is that he again constructs an argument better suited for an initial claim than for overcoming the continuing presumption that he is not disabled. Those cases did not address whether such statements could help determine if a claimant's condition worsened. *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008) (finding similar statements did not support initial disability claim); *Hutsell v. Massanari*, 259 F.3d 707, 711-12 (8th Cir. 2001) ("[D]oing well for the purposes of a treatment program has no necessary relation to a claimant's ability to work or to her work-related functional capacity."); *Gude v. Sullivan*, 956 F.2d 791, (8th Cir. 1992) (same). While these vague wellness pronouncements might still lack great probative impact in the current context, they nonetheless support the contention that he failed to meet *res judicata*'s threshold; that is, a controlled impairment is not a worsening impairment. Moreover, according to Dr. Stoler's penultimate set of examination notes, Plaintiff's Crohn's disease had "clinically improved" on a new Humira dosage. (Tr. at 690, 696.) Further, the notes reported that his perianal induration remained "without abscess or active fistula," and was "stable and tolerable." (*Id.*) Thus, the ALJ could cite them to augment his analysis. And unlike in *Bauer*, they did not seem to make "the biggest impression" on the ALJ. *Bauer*, 532 F.3d at 609.

The other medical evidence the ALJ examined also supports her findings. One of his most severe impairments, the chronic diarrhea, seemed to improve during the present period. (Tr. at 17.) Prior to his procedure in February, Plaintiff reported having five to six bowel movements each day.

51

(Tr. at 17, 542, 599, 601.) By July 2011, near the end of the medical record, Plaintiff said his diarrhea had improved; most days he had only two to three bowel movements. (Tr. at 17, 690, 696.) According to the first ALJ's written decision, Plaintiff then claimed to have eight bowel movements per day, and three to four at night. (Tr. at 64.) While the first decision is not itself medical evidence, it at least indicates that Plaintiff's diarrhea has not worsened. At the hearing, Plaintiff testified his diarrhea caused eight to ten trips to the bathroom each night. (Tr. at 35.) But the ALJ was not bound by this wholly unsupported number. And, in any case, that number appears to be in the same ballpark as the number in the first ALJ's decision, again suggesting he had not worsened. Additionally, Dr. Stoler's final examination report said the diarrhea "very much depends on the food [he] eats . . . ." (Tr. at 691, 693.)

The ALJ further considered other evidence cutting against Plaintiff's claims. She observed that some treatment notes indicated improvement. (Tr. at 17-18.) Dr. Garber's March report, for example, stated Plaintiff's back pain and fatigue had improved. (Tr. at 17-18, 722.) Though he testified that the physical therapy sessions on the bicycle exacerbated his perianal pain, (Tr. at 42), he told Dr. Garber they helped, (Tr. at 200), and he reported to Dr. Cleary that he exercised two to three times per week by cycling or walking. (Tr. at 542, 599, 601.) This suggests his conditions were not as severe as he or the sources claimed, and that they had not backslid. Similarly supportive are the physical examination results, which as the ALJ summarized were largely normal throughout 2011. (Tr. at 18, 219-24, 399, 404, 543, 603, 625, 634-36, 642, 689.) Aside from the perianal issues, the lone exception to these positive findings, flagged by the ALJ (Tr. at 18), came from Dr. Jasbeck's observation that Plaintiff's lumbar mobility had decreased. (Tr. at 625, 689.)

However, nothing else bears out this observation and it would not show sufficient deterioration to overturn the prior findings.

Also, the ALJ appears to have credited Plaintiff's assertion he gained weight since the prior decision, one of only two changes that Plaintiff testified had occurred since that decision. (Tr. at 17, 32.) Evidence exists suggesting both Plaintiff and the ALJ were mistaken. In March 2011, he weighed 313 pounds, (Tr. at 205), and in October 2011 he again weighed 313 pounds, after losing seven. (Tr. at 691, 693.) If anything, then, the ALJ's possible evidentiary error benefitted Plaintiff.

A brief review of the prior decision further confirms his relatively consistent complaints and condition. The decision recounts evidence and testimony that Plaintiff had diarrhea eleven to twelve times throughout day and night; his medication caused fatigue; he did light household chores but needed breaks after five minutes; he napped during the day; he did not leave the house often; he struggled to walk; and he could drive. (Tr. at 64-66.) This list is remarkably similar to his current evidence and complaints: He completed light housework, though it took hours, walking was difficult, and he could drive and leave the house unassisted. (Tr. at 37, 171-81.) And as noted, the only two changes he pointed to at the hearing were weight gain and his general activity level. (Tr. at 32.) The evidence does not support a sufficient drop in his activity level.

Plaintiff also offers a *Chenery* argument, contending that Defendant's motion, on pages thirteen and fourteen, offers impermissible *post hoc* rationalizations. (Doc. 15 at 2-3.) The government as a litigant cannot provide, and the court cannot develop or accept, after-the-fact rationalizations for the agency decision "that the agency had not relied on in its [disputed] decision . . . ." *McClesky v. Astrue*, 606 F.3d 351, 354 (7th Cir. 2010). *See also Larson v. Astrue*, 615 F.3d

744, 749 (7th Cir. 2010) (citing *Chenery I* and holding, "But these are not reasons that appear in the ALJ's opinion, and thus they cannot be used here"); *see also Berryhill v. Shalala*, 4 F.3d 993, 1993 WL 361792, at *7 (6th Cir. 1993) (unpublished decision) ("[I]n large part, an agency's decision must be affirmed on the grounds noted in the decision."). Nonetheless, the court can consider "any evidence in the record, regardless of whether it has been cited by the ALJ" or the Appeals Council. *Blackburn*, 2012 WL 6764068, at *4; *see also Heston*, 245 F.3d at 535 ("Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council.").

Plaintiff's argument fails to persuade. Every citation Defendant makes in that portion of his brief includes the page where the ALJ discussed the same evidence. (Doc. 14 at 13-14.) Defendant notes that the ALJ's reasons for finding no deterioration included her discussion of the drainage procedures and their aftermath; Plaintiff's improving diarrhea; the effect diet had on the diarrhea; the largely normal physical examinations, the lack of evidence of active inflammatory disease; the possibility that Plaintiff's obesity caused his back pain; and the various comments that Plaintiff was "well" and his diseases were "controlled" or in "remission." (*Id.*) The ALJ addressed these exact matters. (Tr. at 17-18.) Defendant does not veer a tittle from the ALJ's analysis. This part of the brief is highly descriptive rather than argumentative, and offers nothing outside the ALJ's decision.

For many of the same reasons set out above, the ALJ's credibility assessment is valid. While credibility findings do not bind subsequent decision-makers, *Hallex*, § I-5-4-62, 1999 WL 33615029, at *9, the analysis nonetheless is refracted through the *res judicata* standard; in other words, ALJs must determine the credibility of plaintiffs' subjective complaints that their condition

54

worsened. The need to demonstrate deterioration thus remains relevant. Here, Plaintiff criticizes the analysis for allegedly overlooking various "clinical abnormalit[ies]," including perianal skin problems, left buttock edema, and spinal immobility. (Doc. 10 at 22.) However, the ALJ did discuss the perianal issues, "chronic buttock pain," and the single observation in the record that his spinal range of motion was limited. (Tr. at 18-19.) Plaintiff's next contends that "none of the records cited by the ALJ support his conclusion that Mr. Erb's Crohn's disease could be managed entirely by diet." (Doc. 10 at 22-23.) But the ALJ never made such a sweeping claim. Instead, she twice noted that Plaintiff's diarrhea seemed largely dependent on his diet. (Tr. at 17, 18.) The phrasing mirrors Dr. Stoler's, who said that Plaintiff's "diarrhea . . . very much depends on the food [he] eats, particularly exacerbated by vegetables and roughage."[6] (Tr. at 725.)

Finally, Plaintiff notes in passing that the ALJ should have considered his extensive work history. (Doc. 10 at 24.) The ALJ clearly considered that history as a source providing Plaintiff with relevant work skills. (Tr. at 19.) Failing to address it explicitly in the credibility analysis does not warrant reversal. The ALJ's analysis checked off every factor in the regulations. 20 C.F.R. § 404.1529(c)(3). She mentioned his daily activities, including naps, "some chores," and "some" cooking, (Tr. at 17); the frequency and intensity of the pain, including his diarrhea, "chronic" anal issues, his "7/10" low back pain rating, and subjective complaints, (*id.*); the aggravating factors, including his diet's effect on his diarrhea, (Tr. at 17, 18); and the medications, treatments, and other measures he employed, including Lyrica, Humira, physical therapy, physician treatments, diet, and exercise, (*id.*). This suffices, and I recommend upholding the analysis.

---

[6] Plaintiff also attacked the ALJ's use of the "well" and "controlled" comments, which was addressed above. (Doc. 10 at 23.)

### 3.   Conclusion

For all these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "'zone of choice' within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035 (quoting *Mullen*, 800 F.2d at 545), as the decision is supported by substantial evidence.

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise

response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  January 29, 2015                 /S PATRICIA T. MORRIS
                                        Patricia T. Morris
                                        United States Magistrate Judge